**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| MARN LARSEN-BALL, on behalf of herself and all others similarly situated, | ) ) ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. _____ |
| COOPER VISION, INC.; ALCON LABORATORIES, INC.; BAUSCH + LOMB; JOHNSON & JOHNSON VISION CARE, INC.; ABB OPTICAL GROUP; WAL-MART STORES, INC.; MEIJER, INC.; COSTCO WHOLESALE CORPORATION; 1-800-CONTACTS.COM; LENSDISCOUNTERS.COM, | ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

---

## CLASS ACTION COMPLAINT

---

   **NOW INTO COURT** comes the Plaintiff, Marn Larsen-Ball ("Plaintiff"), through the undersigned attorneys, and on behalf of herself and all others similarly situated (the "Class"), brings this antitrust action for damages and restitution against the Defendants, disposable contact lens manufacturers, wholesalers, and retailers, pursuant to federal and state antitrust laws. This Complaint is alleged upon information and belief, except as to those allegations which pertain to the named Plaintiff, which are alleged on Plaintiff's personal knowledge.

# TABLE OF CONTENTS

I.   NATURE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Plaintiff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.   Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.   Co-conspirators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III. JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.  FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   The Manufacturers and Independent ECPs Have A History of Colluding to
        Reduce Price Competition for Contact Lenses. . . . . . . . . . . . . . . . . . . . . . . . 8

    B.   Implementation of the RPM Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.   Actions by Manufacturer Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.   Role of the ABB Group and Independent ECPs in Developing and
            Agreeing to RPM Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.   The Manufacturer Defendants Jointly Agreed to Implement
            RPM Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        4.   The Retailer Defendants Agreed to the Manufacturer
            Defendants' RPM Policies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        5.   The RPM Policies and Concerted Action Harm Competition. . . . . . . . . 36

        6.   There Is No Justification for the RPM Policies. . . . . . . . . . . . . . . . . . . 40

    C.   Anticompetitive Effects and Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

V.   RELEVANT MARKETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    A.   Relevant Product Markets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    B.   Geographic Market. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VI.     CLASS ACTION ALLEGATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VII.    CAUSES OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

VIII.   JURY TRIAL DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

IX.     PRAYER FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

-iii-

# I.  NATURE OF ACTION

1.      This is an antitrust class action for damages brought on behalf of consumers in the United States who purchased disposable contact lens products ("contact lenses")[1] manufactured by Defendants Cooper Vision, Inc. ("Cooper Vision"); Alcon Laboratories, Inc. ("Alcon"); Bausch + Lomb ("B&L"); or Johnson & Johnson Vision Care, Inc. ("J&J") (J&J operates in the United States under the "Vistakon" trade name) (collectively, the "Manufacturer Defendants") directly from Wal-Mart Stores, Inc. ("Walmart"), Meijer, Inc. ("Meijer"), Costco Wholesale Corporation ("Costco"), 1-800-Contacts.com ("1-800-Contacts"), and/or LensDiscounters.com (collectively, the "Retailer Defendants") between June 1, 2013 and the present.

2.      Plaintiff alleges that the Manufacturer Defendants perpetuated and accomplished a conspiracy to impose minimum resale prices on certain contact lens lines and thereby eliminate price competition by colluding and agreeing with eye care professionals ("ECPs") (*e.g.*, optometrists and ophthalmologists who sell contact lenses to consumers), ABB Optical Group ("ABB"), a contact lense wholesaler/distributor, the American Optometric Association ("AOA") (the ECPs' trade association), and others to adopt, implement, enforce, and revise resale price maintenance agreements or policies ("RPMs" or "RPM Policy"), sometimes referred to by the Manufacturer Defendants as "Unilateral Pricing Policies" ("UPPs").

3.      The Manufacturer Defendants in turn conspired with the Retailer Defendants, obtaining the Retailer Defendants' agreements to abide by the RPM Policies, which prohibit the Retailer Defendants from discounting certain contact lens products.

---

[1]The term "contact lenses" refers to disposable contact lenses.  Such lenses, which were introduced to the market in 1987, are the most popular contact lens style in the United States and account for approximately 90% of contact lenses sold in the United States.

4. As ECPs themselves have acknowledged, this new pricing scheme represents a "fundamental shift" in how contact lens products are sold to consumers. For example, according to Costco, Costco objected to J&J's RPM Policy and violated it, which resulted in threats from J&J that it would refuse to sell its contact lenses to Costco. As a result, Costco agreed to comply with J&J's RPM Policy, or UPP. Costco admits that its agreement to the RPM Policy "has resulted in substantially higher prices on J&J lenses that Costco sells."[2]

5. As described below, the resale price maintenance policies ("RPMs") which the Manufacturer Defendants call "UPPs" represent merely the latest effort by the Manufacturer Defendants, Independent ECPs, and the Retailer Defendants to ensure that discounting of contact lenses does not occur. The victims are the tens of millions of consumers who use contact lenses.

6. The concerted action to impose minimum retail prices has been implemented through at least the following:

    (a)    Requests, demands, negotiations, and formal and informal understandings between the Manufacturer Defendants, ABB, the AOA, the Retailer Defendants, and others to adopt, implement, and enforce minimum retail prices;

    (b)    Agreement by the Manufacturer Defendants, ABB, and their distributors that none of them will sell contact lenses to any retailer that does not adhere to their RPMs; and

    (c)    Agreement by the Manufacturer Defendants to reinstate, after a time, suspended retailers who indicate their agreement to the minimum retail prices.

7. The resulting minimum retail prices are unreasonably anticompetitive in view of the following and other factors:

---

[2]Complaint, ¶ 9, *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 4:15-cv-00941 (N.D. Cal.).

-2-

(a)     Increased consumer harm in terms of increased prices and reduced choices and innovation without gaining anything in return;

(b)     Increased incentives for prescription choices by ECPs to be influenced by profit considerations that threaten patient care;

(c)     Increased barriers to entry;

(d)     Facilitation of collusion to increase and stabilize prices;

(e)     Increased market power of less efficient retailers;

(f)     Initiation of the restraint on intra-brand competition by retailers;

(g)     Absence of effective inter-brand price competition;

(h)     Concentrated nature of, and barriers to entry in, the manufacturing and wholesale market;

(i)     Adoption of minimum retail prices by Manufacturer Defendants for the most popular contacts, and the fact that doing so was not in their independent interest;

(j)     Control over consumer choice and ultimate demand for Manufacturer Defendants' contact lens products exercised by ECPs through the prescription process;

(k)     Absence of free-riding, brand image, service issues, or other potential manufacturer concerns;

(l)     Intent to raise prices and other anticompetitive motivations of the Defendants; and

(m)     False statements made by Manufacturer Defendants as to the motivations for and effects of the minimum prices.

8.     The RPM Policies of the Manufacturer Defendants – followed by all of the Defendants and their co-conspirators – constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

9.     Defendants' conspiracy has caused Plaintiff and Class members to pay millions of dollars more for contact lenses than they otherwise would have paid.

## II. PARTIES

### A.     Plaintiff

10.     Plaintiff Marn Larsen-Ball is a resident of Chattanooga, in Hamilton County, Tennessee.  She has purchased contact lenses – manufactured by one or more of the Manufacturer Defendants that were subject to an RPM Policy or UPP – directly from one or more of the Retailer Defendants during the Class Period..  As a result of Defendants' actions, Plaintiff paid more than she would have for the contact lenses in the absence of Defendants' conspiracy and was therefore injured in her business and/or property.

### B.     Defendants

11.     Defendant Alcon is a United States company headquartered in Fort Worth, Texas, and is a division of Novartis International AG ("Novartis").  Alcon manufactures eye care products, including contact lenses.  Alcon was the first contact lens manufacturer to adopt an RPM Policy in June of 2013.  Alcon subsequently expanded the number of contact lenses subject to the RPM Policy to four lines in succeeding months.  Jim Murphy ("Murphy"), Vice-President of Alcon, described Alcon's RPM Policy in a public podcast as, inter alia, "a win" for the manufacturers and the doctors.

12.     Defendant J&J is a United States company headquartered in Jacksonville, Florida. J&J belongs to a family of companies specializing in medical devices, pharmaceuticals, and consumer packaged goods, with sales of $71 billion in 2013.  J&J manufactures eye care products,

-4-

including contact lenses. J&J is the largest manufacturer of contact lenses in the country, selling at least 43% of all lenses sold in the United States. J&J implemented RPM Policies with respect to at least eight of its contact lens product lines in June of 2014.

13.     Defendant B&L is a United States company headquartered in Bridgewater, New Jersey, and now owned by Valeant Pharmaceuticals, Inc. ("Valeant"). B&L manufactures eye care products, including contact lenses.

14.     Defendant Cooper Vision is a United States company headquartered in Pleasanton, California. Cooper Vision manufactures eye care products, including contact lenses. In January 2014, Sauflon Pharmaceuticals announced an RPM Policy for the CLARITI family of contact lenses. In August 2014, Cooper Vision acquired Sauflon. On September 20, 2014, Cooper Vision announced that it would continue Sauflon's RPM Policy for the CLARITI family of lenses.

15.     Defendant ABB is a United States company headquartered in Coral Springs, Florida. ABB has its contact lens manufacturing operation, and one of its distribution centers, in Alameda, California. ABB claims to be "the nation's largest distributor of soft contact lenses," and that it "suppl[ies] more than two-thirds of [ECPs] in America with brand name contact lenses, high grade ophthalmic and fully customizable Gas Permeable Lenses." ABB wholesales the contact lenses sold by the Manufacturer Defendants, servicing over 19,000 ECPs nationwide. According to ABB, in 2014, "In support of independent eye care practitioners, ABB founder and CEO Angel Alvarez advocates for the introduction of unilateral pricing policies (UPP) on contact lenses."[3]

---

[3]"ABB OPTICAL GROUP Through The Years Timeline," available at http://www.abbconcise.com/ABB_Corporate/Pressroom.aspx#25Years (last accessed March 9, 2015).

-5-

16.     Defendant Costco Wholesale Corporation is a Washington corporation with its headquarters in Issaquah, Washington.  Costco is a membership-only warehouse club.  As of 2014, Costco is the second largest retailer in the United States and the third largest in the world and is the largest membership warehouse club chain in the United States.  In 2014, Costco's had almost $113 billion in revenue.  Costco sells and distributes contact lenses at its Costco Optical departments.

17.     Defendant Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business at 702 S.W. 8th Street, Bentonville, Arkansas.  Wal-Mart operates a chain of over 11,000 discount retail stores and warehouses in 27 countries.  Walmart is the world's largest company by revenue, approaching $486 billion in 2014.  Wal-Mart sells and distributes contact lenses at its Wal-Mart Vision Centers.

18.     Defendant Meijer, Inc. is a Michigan corporation with its principal place of business located in Walker, Michigan.  Meijer operates a chain of 200 "hypermarket" retail stores in Michigan, Indiana, Illinois, Ohio, and Kentucky, with a distribution center in Wisconsin.  Meijer had over $15 billion in revenue in 2013.  Meijer sells and distributes contact lenses at its Meijer Optical stores.

19.     LensDiscounters.com is a Delaware corporation with its principal place of business located in Buffalo, New York.  LensDiscounters.com has been selling contact lenses on the Internet since 2002.  It has warehouses located in New York, Florida, and California.

20.     Defendant 1-800-Contacts.com is a Delaware corporation with its principal place of business in Draper, Utah.  1-800-Contacts claims to be "the largest retailer of contact lenses in the United States," and "has served more than 8 million customers, stocks more than 15 million contact lenses, and delivers more than 200,000 contact lenses every day directly to customers."[4]

### C.     Co-conspirators

21.     Various entities not named as Defendants in this lawsuit, including but not limited to contact lens distributors, consultants, and ECPs, have participated as co-conspirators with the named Defendants in the antitrust and other violations alleged in this Complaint and have performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to name some or all of these persons as Defendants at a later date.  Plaintiff believes that there is a finite number of co-conspirators whose identities can be ascertained through Defendants' own records.

## III.  JURISDICTION AND VENUE

22.     Plaintiff brings this action to recover damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1) and state antitrust laws.

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

24.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c), because one or more of the Defendants is found or resides in this judicial

---

[4]https://www.1800contacts.com/connect/press-releases/1800contacts-breaks-ground-newcorporate-headquarters

district or had agents in this judicial district, transacted or is licensed to transact business in this judicial district, and because a substantial portion of the affected trade and commerce described below has been carried out in this judicial district.

## IV.  FACTS

### A.    The Manufacturers and Independent ECPs Have A History of Colluding to Reduce Price Competition for Contact Lenses

25.    Because of the price competition engendered by the mass merchandisers and internet retailers, ECPs and contact lens manufacturers have repeatedly attempted to limit or prohibit price competition.

26.    For example, in 1996, consumers and thirty-two (32) State Attorney Generals filed antitrust lawsuits against J&J, B&L, CIBA, and the AOA.[5]  Those lawsuits alleged that the contact lens manufacturers and the AOA (the Independent ECPs' trade association) "conspired among themselves . . . to restrict the supply of replacement contact lenses to alternative channels of distribution."  Specifically, the plaintiffs alleged a classic group boycott: that the manufacturers and the AOA restricted wholesale sales to "alternative suppliers" (*e.g.*, mail order houses and pharmacies), and that but-for this conspiracy, the plaintiffs would have paid lower prices for contact lenses.  *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030, 2001 WL 493244 (M.D. Fla. Feb. 8, 2001).

27.    In 2001, the district court denied the various defendants' motions for summary judgment.  *Id.*  Employing both a *per se* analysis and an alternative Rule of Reason analysis, the court evaluated whether "a reasonable fact finder could conclude from the evidence that the ECP

---

[5]*See In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524 (M.D. Fla. 1996).

community threatened to boycott any manufacturer who did not implement an ECP-only distribution policy and that [d]efendant manufacturers reached a tacit, if not express, agreement with the ECP community and each other to restrict sales to alternate channels." In concluding that the plaintiffs had "proffered ample evidence" to overcome the summary judgment motions, the district court pointed to the following pieces of evidence, among others:

> • "A Vistakon [(now J&J)] memo discussing the agenda for the ASSOCIATION/Vistakon meeting that took place January 15, 1992 stating, inter alia, 'reduc[ing] the possible trend away from prescribing Acuvue/Surevue as a result of patients'[sic] buying lenses from outlets other then [sic] their own practitioner.'"

> • "A deposition excerpt wherein Vistakon's Consumer Products Director was asked why Vistakon changed its policy, stated 'We couldn't sell our products and doctors were saying to sales reps, 'I am losing patients; therefore, I don't want to put any more new patients in Acuvue because they will walk out of my door.''"

> • "A memo written by Vistakon's D.R. Yadon, given to Vistakon sales personnel which is entitled 'Vistakon Gets Tough on Diverters,' discussing a 'joint effort between the manufacturers and professional organizations to address this [diversion] problem.'"

> • "A memo written by Craig Scott, Vistakon's Vice President for Marketing to Phillip Keefer discussing 'our action plan' regarding patient retention. . . . The stated objectives were to assist ECPs in retaining patients and to maintain ECPs 'positive attitude toward fitting new patients with Vistakon products.' The two strategies listed to further those ends were to reduce the supply and the demand for diverted products. The memo went on to discuss, inter alia, disguising the prescription from the patient and also discussed obtaining ASSOCIATION feedback on the aforementioned proposals."

28. After the district court denied summary judgment, and following several weeks of trial, the parties settled. B&L paid $8 million into the settlement fund, offered a benefit package valued at $121 to the class members, and agreed to sell its contact lenses to the alternative channels

-9-

of distribution on a non-discriminatory basis.  J&J paid $25 million into the settlement fund, offered a benefit package valued at $100 to the class members, and agreed to sell its contact lenses to the alternative channels of distribution on a non-discriminatory basis.  The AOA paid $750,000 into the settlement fund, agreed to not restrict where consumers could obtain their replacement contact lenses, and agreed not to oppose the release of contact lens prescriptions.  The AOA also agreed not to make claims that eye health was impacted by the retail channel from which the contact lens was purchased.

29.     While this settlement resolved the issues as to the discriminatory practices of J&J, B&L and Alcon's predecessor, other manufacturers continued to engage in these practices.  On September 15, 2006, the Commerce, Trade and Consumer Protection Subcommittee of the House Energy and Commerce Committee held a hearing entitled *Contact Lens Sales: Is Market Regulation the Prescription?*  Subsequently, the manufacturer most visibly engaged in restrictive distribution policies abandoned the practice, effectively making the need for the legislation moot.

30.     More recently, in 2009, the German Federal Cartel Office levied a fine of €11.5 million against CIBA for fixing minimum resale prices of contact lenses and restricting internet and wholesale prices of its contact lenses.  CIBA was found to have utilized an internal "price maintenance" program whereby it enforced minimum resale prices for contact lens in violation of European Community and German law.

31.     Last year, Manufacturer Defendants J&J and B&L were fined by China's National Development and Reform Commission ("NDRC") for violating China's Anti-Monopoly Law.  In May of 2014, J&J was fined 3.6 million yuan and B&L was fined 3.7 million yuan for adopting RPM Policies and requiring retailers to adhere to the Policies, among other practices.

-10-

32.     Independent ECPs and ABB have engaged in other practices to limit retail price competition.  For example, before the Manufacturer Defendants implemented the RPM Policies, ABB not only facilitated the exchange of retail price information among ECPs, but also urged ECPs to adopt uniform pricing.

33.     ABB publishes a quarterly pricing survey, called the Retail Price Monitor, which calculates average prices for the biggest-selling contact lens lines.  The survey relies on the prices of more than 450 practices.  The *Retail Price Monitor* "makes it easy" for ECPs to set contact lens prices and "maximize contact lens margins."  ABB also operates yourlens.com, which independent ECPs can use to order contact lenses online, and which provides suggested retail prices.  As stated in ABB's promotional materials, "Yourlens.com takes the guesswork out of setting your online prices by utilizing our Retail Price Monitor suggested prices."

**B.     Implementation of the RPM Policies**

**1.     Actions by Manufacturer Defendants**

34.     Alcon was the first of the Manufacturer Defendants to announce a RPM Policy. Although Alcon initially announced an RPM Policy for a single product line, Alcon now has RPM policies on four of its contact lens brands.  In June of 2013, Alcon implemented its first RPM Policy for its DAILIES TOTAL1® contact lenses.  In January of 2014, Alcon extended its policy to three other lines of contact lenses: DAILIES® AquaComfort Plus® Multifocal and DAILIES® AquaComfort Plus® Toric contact lenses.  And in June of 2014, Alcon extended its RPM policy to AIR OPTIX® COLORS contact lenses.  Alcon has sought the written consent of ECPs to its RPM Policies or alleged unilateral pricing policies (sometimes referred to as "UPPs").  According to one optometrist who wrote on "ODs on Facebook," an Alcon representative "made a special appointment

-11-

with me to discuss UPP and to have me sign paperwork indicating that I understood and agreed to the policy." Another ECP on the same website confirmed that this was Alcon's standard practice.

35. In February of 2014, B&L implemented an RPM Policy for its ULTRA™ line of contact lenses.

36. In June of 2014, J&J announced RPM Policies for all of its major contact lens lines. At the same time, J&J announced that it would discontinue contact lens lines that would not be subject to a UPP. The contact lens lines subject to an RPM policy are as follow:

- 1-Day ACUVUE® MOIST®

- 1-DAY ACUVUE® MOIST® for ASTIGMATISM

- 1-Day ACUVUE® TruEye®

- ACUVUE® OASYS® with HYDRACLEAR®

- ACUVUE® OASYS® for ASTIGMATISM, and

- ACUVUE® OASYS® for PRESBYOPIA

These policies became effective on July 1, 2014 for a six-month supply of ACUVUE® OASYS® with HYDRACLEAR® and on August 1, 2014 for the remaining contact lens lines.

37. According to J&J, its RPM Policies will impact roughly 9.66 million consumers, or 69% of the 14 million consumers of J&J contact lenses.

38. Laura Angelini ("Angelini"), President of J&J, announced J&J's policy in a written communication to ECPs on June 24, 2014. A trade article described the announcement as follows:

> Last week, in a letter addressed to [ECPs] dated June 24, 2014, Laura Angelini, president, Johnson & Johnson Vision Care – North America, announced the company's launch of its "Enterprise Strategy" and "roadmap for the future," part of which includes resetting the price of specific contact lens products in the U.S. according to a new "unilateral pricing policy."

-12-

Now, all wholesale customers will receive the same pricing for certain existing contact lenses already offered in the company's portfolio, Angelini told VMail. The policy applies to the company's number one reusable, Acuvue Oasys, its number one disposable, Acuvue Moist, and its 1-Day Acuvue TruEye, which Angelini described as the company's "strategic brands." The new policy also sets minimum retail pricing, which has been communicated to all its customers. In addition, manufacturer's rebates have been eliminated by building those discounts into the retail price of these legacy products rather than requiring customers to send in proof of purchase to obtain rebates.

Angelini described this new pricing as a "holistic multifaceted pricing policy to refocus the conversation between the doctor and the patient on eye health and product performance rather than price. This gives the optometrist the ability to improve his or her capture rate in the office," she told VMail. "Now the patient has no incentive to shop around."

The letter to [ECPs] described the three areas in which the company would "demonstrate support for the profession and the professional—Prescribers, Portfolio and Preferred Partners." Also in June of 2014, J&J announced that it would discontinue certain subbrands of ACUVUE® ADVANCE®, a product line not subject to RPM Policies, on August 1, 2014, and would eliminate the other non-RPM lines on March 31, 2015. A policy letter prepared by J&J and disseminated to its customers made it clear that "[b]ecause an advertisement to beat any price logically commits a reseller to beat even a price that already is below the UPP Price, [J&J] will regard an advertisement promising to beat any price or using similar words to be an advertisement to sell for less than UPP Price."

39.     In September of 2014, Cooper Vision became the last major contact lens manufacturer to implement a RPM Policy. Cooper Vision implemented an RPM policy with respect to its Clariti contact lens line, which it acquired through its purchase of Sauflon, another contact lens manufacturer, for $1.2 billion in August of 2014. In January of 2014, Sauflon had instituted a UPP on the Clariti line, and Cooper Vision decided to maintain the UPP after it purchased Sauflon.

-13-

40.    Under the RPM Policies, contact lens retailers are not allowed to offer discounts on these lines where the discounted price would be below the RPM Policy price.  As Dr. Milicent Knight ("Knight"), head of Professional Affairs for J&J, said at the Senate Hearing, "[r]etailers maintain the right to offer store coupons, rebates or promotions (discounts) under the ACCUVUE Unilateral Pricing Policy, provided that the final net price for the product covered by the UPP remains at or above the UPP Minimum Retail Price, after discounts are applied."

41.    RPM Policies are enforced by the Manufacturer Defendants' threats to cut off supply to retailers that refuse to observe minimum price levels and through other coercive means.  As Knight also explained to the United States Senate:

> Johnson & Johnson Vision Care, Inc. has three separate processes for proactive Market Price monitoring.  First, there are internal resources (J&J employees) dedicated to researching, confirming and notifying sellers of UPP violations.  In addition, Johnson & Johnson Vision Care, Inc. has retained two (2) independent firms to assist in monitoring Market Prices.  The first of these firms monitors all online pricing and advertising, the second conducts in-store price validations nationwide.  All customer types, regardless of size, geography, distribution method, etc. are included in one or more of these monitoring efforts.  If a customer is found to be in violation of the UPP, then Johnson & Johnson Vision Care, Inc. will no longer sell products subject to the policy to that customer.

42.    J&J expanded on its enforcement measures in a November 5, 2014 circular sent to its customers about its RPM Policies.  That circular stated "[i]f you sell product below the UPP price, [J&J] and its authorized distributors [such as ABB] will refuse to accept new orders from you. In addition, [J&J] will exercise its right to repurchase your current inventory of products subject to the UPP price."

43.    In a prepared statement presented at the Senate Hearing, Alcon made a similar point:

-14-

As a result of this situation, Alcon chose to create an environment in which ECPs might more likely spend time learning about the new technology and explaining it to patients, all while having the opportunity to make a reasonable profit margin. It did so by adopting its Unilateral Pricing Policy, or UPP, when it launched DAILIES TOTAL1® in 2013. That policy provided that Alcon would not supply DAILIES TOTAL1® to customers who resold it for less than the price announced by Alcon.

44.     B&L made a similar point in announcing its UPP:

[E]ach customer is free to advertise or charge whatever price it wants, but should understand that Bausch + Lomb will cease to supply, and will prohibit its authorized distributors from supplying, Bausch + Lomb Ultra® contact lenses to any customer that resells or advertises Bausch + Lomb Ultra® contact lenses to the end consumer (*e.g.*, patient) for sale at less than the MRP.

45.     The Manufacturer Defendants actually carry out these threats as to the contact lens lines where the ECP or retailer sells below the UPP. In an article that appeared in the *Review of Cornea And Contact Lenses* in June of 2014, Gerber stated:

Manufacturers employing UPP have the ability to "cut off" a doctor who does not abide by their pricing policy. Some practitioners question the ability and willingness of manufacturers to enforce these rules. To date, I'm aware of several instances where a manufacturer with a UPP has prohibited an online vendor from selling below the UPP. The hope is that all manufacturers with UPP lenses will follow suit, should other resellers not play by the rules.

46.     Similarly, Alvarez of ABB has stated publicly that the Manufacturer Defendants are very serious about policing their respective RPM Policies and that he knew firsthand that some ECPs had been given a "warning" for violating them. He said manufacturers are "holding the gun" and are willing to lose business in order to police their RPM Policies. Similarly, Murphy of Alcon confirmed that it warns violators that they are selling below the MRPM and gives them an opportunity to cure. After a third-party auditor confirms a violation, the retailer is communicated

-15-

with and "asked to make a correction" within five days. Only if the violator refuses to increase its price does Alcon punish the violation by prospectively denying access to the product for up to one year. The clear implication of Alcon's warning system is that a retailer who has sold contact lenses below the MRPM can regain access to the product by agreeing to abide by the MRPM.

47.     Alvarez has indicated that "Unilateral Pricing Policy will bring a Fundamental Shift to the optical industry," calling them a "business-focused industry shift that many manufacturers have implemented."

48.     As a result of the Manufacturer Defendants' enforcement of the RPM Policies, the Retailer Defendants agreed to abide by them.

> **2.     Role of the ABB Group and Independent ECPs in Developing and Agreeing to RPM Policies**

49.     Independent ECPs colluded with the Manufacturer Defendants in developing the RPM Policies. Independent ECPs did this in order to increase profit margins, combat price discounts from online retailers and big box stores, and eventually, eliminate competition at the retail level altogether. Once that competition is eliminated, Independent ECPs will be able to charge whatever price they desire for contact lenses, as the RPM Policies are a minimum rather than a maximum resale price. The Manufacturer Defendants agreed to collude with Independent ECPs because a prescription from an ECP is required for the Manufacturer Defendants to sell their contact lens lines.

50.     Robert Atkinson ("Atkinson"), President of Information Technology and Innovation Foundation, testified at length on the collusion with ECPs at the Senate Hearing (footnotes omitted):

> But how do optometrists convey this desire to prescribe UPP lens to producers? . . . In the case of the eye care industry, the collusion may not be in a smoke-filled room, but it's collusion all the same. In this case, it's professional collusion through norms that is leading producers to adopt UPP policies.

-16-

In the optometry profession these anticompetitive social norms are expressed in a variety of means, particularly in articles in professional journals and on social media channels that send a clear message to optometrists that they should prescribe doctors'– only lenses. For example, in an article in Review of Cornea and Contact Lens Gary Gerber, OD, writes:

"One of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away. While this may create friction with buying groups, the benefits outweigh any ancillary issues. More importantly, however, it forces practices to focus on something other than price to keep prescriptions in their office – if all 'retailers' sell the lenses for the same price, the method and environment under which they are sold will be the factors that determine where a patient decides to purchase their lenses.

He goes [on] to in essence to say, with UPP, optometrists will prescribe the UPP lens:

"Manufacturers also benefit from UPP because retail price erosion can be stopped. With a 'race to the bottom' from aggressive price cutting eliminated, motivations to fit a particular lens increase; this has the ability to support and protect brand equity. . . . All things being clinically equal (which of course they rarely are), savvy practitioners will give serious thought to prescribing UPP lenses. For example, if you have a patient with astigmatism and they can wear a UPP lens, and a non-UPP lens is clinically equivalent, a smart doctor will choose the UPP option."

Finally, he states what is obvious to everyone in the industry "Finally, the actual price mandated by UPP has so far been higher than lenses that do not have a UPP. This has afforded higher profit margins and created a new sense of excitement surrounding contact lenses." Likewise, in an article in Review of Optometric Business, Paul Karpecki, OD, FAAO writes in favor of UPP, stating "One other exciting development: Independent practice optometry becomes reinvigorated with contact lens prescribing as a profitable specialty and practice differentiator."

We see similar statements on optometrist social media sites. On the Facebook site "ODs on Facebook", a post from a person listed as Steve Silberberg (who lists himself as "ODwire.org supporting member") on the topic "J&J goes to universal pricing" writes with

-17-

regard to having to give "No more rebates etc. and 1-800 etc. goes away if they all follow B&L Alcon and now J & J. Cooper next." In other words he is saying with RPM Policies competitors like 1-800-Contacts that sell for less will go out of business. And he is not so subtly encouraging CooperVision to also use UPP pricing. Another ODwire.org supporting member listed as Stephen McDaniel writes in response to J&J adopting UPP pricing, "Wow, great news. Now I might actually fit more of their lenses. Hopefully Cooper gets on board with this soon." In other words, he is saying that he prescribes lenses based on what level of profit he makes. And he is implying that if Cooper Vision doesn't also adopt UPP then he will not prescribe their lenses. Another member, listed as Joe DiGiorgio, OD, writes in response to a question of how to tell your patients that these prices of industry regulated lens: , "I think I'll tell my patients that the onliner must have been selling counterfeit contacts. Why else would they suddenly raise their prices to what I'm selling them."

And they express this collective desire in meetings with industry representatives. For example, in the Facebook OD site, a person listed as Kerry Kordet Giedd ["Giedd"], writes, "At the Ultra launch last week with 300+ ODs from around the country present there was a Huge applause (honestly, it was quite an overwhelming response) when B&L (Bausch and Lomb) announced the UPP. Without a doubt they were largely pleasing their OD base when they followed Alcon's lead on the UPP. . . . I think B&L will gain far more than they lose in practitioner [sic] loyalty and support of this policy."

51.     Zeidner of 1-800-Contacts gave similar testimony at the Senate Hearing.

52.     ECPs have consistently spoken out in support of the RPM Policies, touting their benefits both to ECPs and to the Manufacturer Defendants. Some of these ECPs are actually employed by the Manufacturer Defendants. Barry Eiden, OD ("Eiden"), for example, told an audience at the Global Contact Lens Forum that the new pricing policies represented "one of the monumental changes in contact lenses in my career." Eiden is employed as a consultant for Manufacturer Defendants Alcon, B&L and Cooper Vision. He is also an Independent ECP and the past Chair of the Contact Lens and Cornea Section of the Association.

-18-

53.     Other Independent ECPs paid by the Manufacturer Defendants have also lent support to the new pricing policies.  For example, Giedd, who is referenced in Atkinson's testimony at the Senate Hearing, pledged her support in industry publications at the same time that she was being paid as a consultant by Alcon and Cooper Vision.  Similarly, David L. Kading, OD ("Kading"), who consults for Alcon, stated that the new pricing policies are "fantastic" because they set "an even playing field and it also does not support companies who want to price cut their products in an effort to increase utilization."  Kading further stated that "[a]s a doctor, it allows me to let patients know they won't find the lenses cheaper anywhere else."

54.     ECP support for the RPM Policies is widespread and hardly limited to spokespersons paid by the Manufacturer Defendants.  Other ECPs and their agents and trade associations – including ABB, the AOA, and state-level optometric associations – have enthusiastically endorsed and supported the Manufacturer Defendants' RPM Policies, recognizing that they signal an end to retail price competition for contact lenses.  A poll on Healio.com/Optometry posted after the Senate Hearing queried ECPs regarding the concept of the RPM Policies and, of 204 respondents, 85% said they supported them.  Another poll, conducted by ABB, similarly found high approval by ECPs of the RPM Policies.  According to Alvarez, 82% of the hundreds of doctors surveyed support them.

55.     The AOA has also been highly supportive of the Defendant Manufacturers' use of RPM Policies.  Indeed, David Cockrell, President of the AOA, testified in support of the Manufacturer Defendants' actions at the Senate Hearing, and the AOA submitted written comments in support of those actions.  The AOA and state associations of optometrists have also been active in opposing legislative efforts in certain states to condemn the Defendant Manufacturers' use of RPM Policies.

-19-

56.     J&J publicly acknowledged the role that ECPs played in its formulation of a UPP. Angelini said that J&J was motivated to implement its RPM Policy based on feedback received from ECPs regarding price erosion.   In the June 24, 2014 letter addressed to ECPs that is mentioned above, Angelini explained:

> When I last communicated with you about six months ago, I shared that Johnson & Johnson Vision Care, Inc., North America (JJVC), was in the process of carefully assessing our overall strategy so that we could best meet the needs of our customers, and asked for your feedback on what we were doing well and areas where we could improve.  Thanks to your open and candid responses, we were able to define our strategy and implement the changes and actions you told us were needed. . . . You, the [ECP] who prescribes our products, have our unwavering support for your clinical, business, and patient needs. . . . . To further demonstrate our commitment to prescribers, beginning this week, many of you will begin to hear from your JJVC Sales Representative about our new pricing strategy within the United States.  This includes a Unilateral Pricing Policy (UPP) . . . . We believe the multifaceted nature of this new pricing strategy and the variety of elements that comprise the program will allow you to refocus the critical doctor/patient conversation on eye health and product performance, rather than cost.  Also, by removing the complexity of rebates and building these savings into our new pricing, we believe we will be able to reach more patients with instant savings, while providing a simpler approach for everyone.

57.     In a follow-up letter sent by Angelini to ECPs on or about December 17, 2014, she confirmed that J&J had extended an invitation to ECPs a year previously to "share your thoughts" on how J&J "could build and enhance our partnerships to help you meet the evolving needs of your patients and practices.  Since then, your open and candid feedback was instrumental in helping us create Our Enterprise Strategy," which included the "new pricing strategy" by J&J's RPM Policy. Angelini welcomed continued feedback from ECPs, promising that they "can reach me and my leadership team at any time. . . ."

-20-

58.     Robert Ferrigno, President of North America for Cooper Vision, made a similar point in connection with Cooper Vision's adoption of a RPM Policy on one of its product lines, saying his company held twelve focus groups and met with 100 ECPs before acting.

59.     One ECP on Gerber's September 13, 2014 "Power Hour" podcast noted that Manufacturer Defendants' representatives actively counsel ECPs on how to sell contract lenses under the RPM Policies.  He stated, "you don't have to push the annual supply, because it doesn't matter – they [the parties] are going to spend the same amount of money, whether they do it in six month increments or two month increments."  As the ECP explained, "[s]o, they kind of encourage you to get one box out of each eye and go from there."  J&J has also been willing to negotiate the particulars of how large customers implement its RPM Policies, as reflected in the complaint filed in the *Costco Action*.

60.     ECPs have also been instrumental in helping to police the use of RPM Policies.  The website "ODs on Facebook," for example, gives instances of ECPs informing Alcon's sales representatives about potential violations and requesting them to take action.

61.     ABB played a principal role on behalf of ECPs to cause the Manufacturer Defendants to develop and implement the MRPMs.  As early as February of 2013 – before any of the Manufacturer Defendants had instituted RPM Policies – Alvarez stated publicly that ABB's focus was to be "aligned with manufacturers."  A subsequent press statement by Alvarez confirmed ABB's integral role in developing the MRPMs:

> Angel Alvarez, chief executive officer and founder of ABB Optical
> Group, issued a statement to PCON regarding the company's stance
> on RPM Policies.  "ABB has been working closely with
> manufacturers to develop [MRPMs], which we believe enable a better
> overall patient experience by supporting competitiveness of
> prescribing practitioners," Alvarez said.  "Contact lens fitters have

always been and will always be a focus of our organization.  We do everything possible to help them succeed."

62.     ABB also issues publications that allow Independent ECPs (and the Manufacturer Defendants) to monitor the pricing of contact lenses in order to ensure that prices set pursuant to RPM Policies are being followed.  It publishes a quarterly *Retail Price Monitor* that facilitates this goal.  ABB describes this publication as follows on its website: "[t]he ABB OPTICAL GROUP Retail Price Monitor provides [Independent ECPs] with the retail pricing structure of brand name lenses charged by private practitioners and leading online retailers. . . . The Retail Price Monitor is a benefit to ECPs looking to consolidate purchasing and maximize margins."  As Alvarez stated in a press release issued in August of 2014, "[o]ur Q3 Retail Price Monitor that will be mailed with our Profit Advisor newsletter will show ECP's that they can continue to have a retail strategy by promoting annual supplies and staying within the limits of UPP."

63.     As one ECP put it, "[o]ne of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away."  This same commentator also agreed that the Manufacturer Defendants "also benefit from UPP because retail price erosion can be stopped."

64.     The 2014 third quarter issue of ABB's publication *Profit Advisor*, sent to Independent ECPs across the country, stated that the RPM Policies were one of the first "business-focused shifts" in the industry.  It went on to advise Independent ECPs to charge more than the UPP:

> You know that competitors around the corner or the country cannot sell their contact lens for less than UPP. ECPs are staying in line, too, because the manufacturers are watching them.  Seller who choose to ignore UPP policy run the risk of being unable to purchase lenses from the manufacturer.  Remember that UPP specifies the lowest price at which a particular lens can be sold. Can you sell it for more? Indeed, yes, and I encourage you to do so. Increase your price by

-22-

several dollars—and continue using the best strategy of explaining to your patients and customers that although they may be paying a few dollars more per box, they are receiving the various benefits that you offer. See the Soft Lens Retail Price Matrix for a suggested retail pricing strategy on the UPP products. In fact, I encourage you to adopt a policy of saying that you'll match any legitimate price on these contact lenses. You already know what the price is; it's the UPP price. It won't hurt your bottom line to match the UPP for annual supplies and for the very small percentage of customers who call on you to do so. And I expect that the vast majority of your customers will respond to your value proposition and pay your retail price. Most patients aren't looking for the absolute rock-bottom price. . . . As a result of UPP, I believe that the prescribing practitioner will be able to obtain a higher percentage of patient revenue.

65. Alvarez repeated his advice that Independent ECPs charge their customers more than the MRPM price in a September 13, 2014 broadcast of the "Power Hour" radio hosted by Gerber, saying that ECPs should try to reach a gross profit margin of 48%-49%. Gerber concurred, saying that ECPs "should be charging more [than the MRPM] because they can."

66. Thus, ABB and its cohorts viewed the Manufacturer Defendants' RPM Policies as an occasion to gouge consumers even more for the price of contact lenses than would have been possible prior to the implementation of those agreements, with the hope that many consumers would not even realize they were paying a surcharge on the price mandated by RPM Policies that was duplicative of the service fees that they were already paying. And ABB collected data in its *Retail Price Matrix* that facilitated the ability of Independent ECPs to engage in such systematic price-gouging.

### 3. The Manufacturer Defendants Jointly Agreed to Implement RPM Policies

67. Collectively facing pressure from Independent ECPs and ABB about competitive threats posed by the big box stores, on-line retailers, and club stores, the Manufacturer Defendants

agreed with one another and with ABB and the Independent ECPs to impose RPM Policies on their most advanced and most popular contact lenses lines.

68.     There is substantial evidence showing that the Manufacturer Defendants agreed with ABB and ECPs to enter into RPM Policies.  There is also substantial evidence showing that the Manufacturer Defendants agreed with one another to enter into RPM Policies.  That evidence includes the following.

69.     ***Industry Structure Conducive to Collusion.***  The four Manufacturer Defendants control 97% of the market for contact lenses.  As noted above, the contact lens industry is a mature one with high barriers to entry that involves a commoditized product.

70.     ***Opportunities to Conspire.***  Some Manufacturer Defendants were members of the Contact Lens Manufacturers' Association ("CLMA") and were the only members of the Contact Lens Institute ("CLI"), the activities of which are described below.  As members of this CLMA, the Manufacturer Defendants had regular opportunities to meet, exchange information, and signal intentions to one another.  The CLMA hosts an annual meeting, publishes bi-weekly presidential updates to its members, and regularly publishes a newsletter.

71.     ***Information Exchanges.***  The exchange among competitors of competitively sensitive, non-public information can be indicative of a price-fixing conspiracy and this conduct itself can violate the antitrust laws.  Such exchanges occurred in the context of the CLI. According to the CLI's website, it was created to "represent[] the interests of its members . . . ."  CLI has no members other than the Manufacturer Defendants.  Its board of directors consists of one executive from each of the Manufacturer Defendants.  CLI's Chair is Angelini of J&J.  Its Vice-Chair is Andrew Sedgwick, Vice-President of Global Commercial Strategy & Business Development for

-24-

Cooper Vision. Its Treasurer is Richard Weisbarth, Vice-President of Professional Affairs for Alcon. Its Director is Joseph Barr, Vice-President of Clinical and Medical Affairs for B&L. Contemporaneously with the Manufacturer Defendants' adoption of RPM Policies, the CLI "newly created" a committee "to develop a collaborative approach by the member companies to help inspire ECPs and their staff to proactively pursue opportunities to fit CLs [contact lenses] and appropriately follow up so that their patients and practice will benefit."

72. The CLI's website further notes that "[t]he members of the CLI, together with other participating companies participate in a quarterly statistical program to track manufacturer shipment data of Contact Lens and Lens Care products which is managed by Veris Consulting ['Veris']. The program's objective is to provide participants with accurate and timely consolidated market data. . . . . Each participating company in the CLI Statistical Program has a representative on the CLI Global Statistical Task Force." According to Veris' website, the program established by it for the CLI "track[s] sales at a detailed level worldwide" and "is more valuable than other sources of market data because sales are reported directly from manufacturers." Veris states that its work for the CLI "is the only program where the data is reviewed annually by Veris to ensure accuracy. Veris implemented this internal review process to reassure participants that they could be confident in the data." Indeed, Veris requests that "the finance department at each manufacturer's headquarters . . . . [pull sales information and revenue data] directly from their internal system at the model, or SKU level." The resulting low margin of error "is extremely important to participants since they use this data for strategic planning" and is reported to the Manufacturer Defendants on a quarterly and annual basis.

-25-

73.     According to its website, Karen Eftekari, the person at Veris who is the Senior Manager for this work, "also works with member companies [of CLI] such as Johnson & Johnson and Bausch & Lomb performing high-level data analysis and designing custom reporting tools and dashboards." The CLI functions as one of the vehicles through which the Manufacturer Defendants collude to enforce and monitor their respective MRPMs. The CLI price monitoring program allows the Manufacturer Defendants to keep their fellow manufacturing in line and prevents cheating among the group.

74.     ***The ABB Group's and Independent ECPs' Conduct.*** The Manufacturer Defendants' close relationships with ECPs and with a principal ECP representative, Defendant ABB, enabled the Manufacturer Defendants to collaborate with the ECPs and ultimately with each other to develop the RPM Policies. As noted above, ABB has stated publicly that it "work[ed] closely with manufacturers to develop unilateral pricing policies." Similarly, the Manufacturer Defendants have stated that they collaborated with ECPs to develop the policies. J&J, for example, in its letter to ECPs announcing its RPM Policy, stated that it developed the policy in response to ECP "feedback," that ECPs were "instrumental" in formulating J&J's policy, and that J&J's implementation of that policy "further demonstrates our commitment to [ECPs]." As also noted above, Cooper Vision has admitted that it decided to use a UPP on its Clariti line of contact lenses in direct response to feedback from Independent ECPs. During this collaborative process, on information and belief, ABB and the ECPs communicated to each Manufacturer Defendant its competitors' position on RPM Policies.

75.     ***Acts Contrary to Economic Self-Interest.*** The acts of the Manufacturer Defendants in adopting RPM Policies were contrary to each one's independent economic self-interest. In a

-26-

candid analyst presentation made on September 11, 2014, Cooper Vision admitted the "Potential Downsides/Challenges" of adopting RPM Policies included: (a) "Enforcement can be challenging"; (b) "Consumer activism may generate legislative backlash and negative public perceptions"; and (c) "May alienate larger customers who want greater pricing freedom and cross marketing." Yet only days later, it adopted an RPM Policy on its new flagship Clariti line of contact lenses.

76.     The other Manufacturer Defendants faced similar adverse impacts, as reflected in the events of 2014 and early 2015, which included complaints to the FTC, the Senate Hearing, a publicly-revealed investigation by the New York AG into Alcon's adoption of RPM Policies, negative consumer backlash and proposed legislation in various state legislatures. Despite these reasons not to implement RPM Policies, all four Manufacturer Defendants proceeded to do so.

77.     Another consequence in 2014 of doing so was slower sales growth, which was certainly contrary to their individual economic self-interests. One industry analyst has noted that United States contact lens sales growth only increased sluggishly by 2% through the third quarter of 2014, a development that it attributed to the implementation of RPM Policies.

78.     Further demonstrating that the Manufacturer Defendants implemented RPM Policies contrary to their individual economic self-interest, Dean Butler, the founder of LensCrafters, has stated that consumers purchase more eye care products – including contact lenses – when shopping online.

79.     Similarly, as noted above, the ABB's Alvarez has said publicly that the Manufacturer Defendants are willing to lose business in order to enforce their RPM Policies, something that is not in their independent economic self-interest. The Manufacturer Defendants have tried to justify their conduct by claiming that consumers could be injured by buying contact lenses from shoddy retailers

-27-

who provide low-quality service. That purported justification is pretextual – a fact that also supports an inference of conspiratorial conduct. As a February 18, 2015 article in the Salt Lake Tribune noted, when the Chairman of the Utah Senate Business & Labor Committee questioned an industry lobbyist on this purported justification at a legislative hearing held on February 17, the latter "could not provide an example of that ever occurring." Indeed, Carol Alexander ("Alexander"), a Director of Professional Affairs at J&J, stated during this hearing that she could not identify a single instance where a patient was harmed or placed at risk because he or she was able to buy contact lenses from a source other than optometrists. Alexander admitted that the adoption of RPM Policy by J&J was not motivated by concerns about patient risk or harm.

80.    Similarly, Costco has explained that J&J "asserts this change [adoption of an RPM Policy] is for the benefit of patients—we totally disagree." The allegations of the complaint filed in the *Costco Action* further support this assertion.

81.    It was thus contrary to the economic self-interest of any one of the Manufacturer Defendants to attempt to implement an RPM Policy without assurance that its competitors would follow suit. The discounters referred to above collectively possessed sufficient buying power in the contact lens market that no Manufacturer Defendant would be willing to forego those sales or alienate those customers by acting alone. If only some of the Manufacturer Defendants had adopted RPM Policies, discounters such as Costco or Wal-Mart could have shifted market share to those manufacturers that did not dictate a minimum retail price. In fact, after all of the Manufacturer Defendants except for Cooper Vision had implemented RPM Policies, Costco sent a letter to its customers informing them of the other Manufacturer Defendants' RPM Policies and urging them to switch to Cooper Vision, only to see Cooper Vision soon thereafter implement an RPM Policy on

-28-

its flagship Clariti line.

82. ***Motive to Conspire, Including Assurances That Competitors Will Also Act.*** Each of the Manufacturer Defendants had a motive to maintain high retail prices for its contact lenses. They were concerned that low retail prices would put pressure on them to lower wholesale prices. In addition, in order to encourage Independent ECPs to prescribe their contact lenses, the Manufacturer Defendants needed to keep the retail prices high. ABB, which (a) is the largest distributor of contact lenses in the United States, (b) sells the Manufacturer Defendants' contact lenses to two-thirds of ECPs, and (c) has stated publicly that it "worked with" the Manufacturer Defendants to develop and implement the MRPMs, was in a position to act as the "hub" in a "huband- spoke" conspiracy. That is, ABB was in a position to communicate to each Manufacturer Defendant before it implemented an RPM Policy that its competitors also intended to do so.

83. ***Abrupt, Near-Contemporaneous and Fundamental Shift in Pricing Policies.*** Before June of 2013, none of the Manufacturer Defendants restricted the minimum retail price of its contact lenses. After Alcon imposed the first RPM Policy in June of 2013, all of its competitors followed suit within 15 months. As Alvarez of the ABB Group, put it, the RPM Policies represent a "Fundamental Shift" in the contact lens market. As noted above, contact lenses are the only prescription medical device sold in the United States pursuant to an RPM Policy.

84. ***Past Conspiratorial Conduct.*** The Manufacturer Defendants and Independent ECPs have also demonstrated a past propensity to conspire against discounting retailers of contact lenses, as reflected in the discussion above of the First Contact Lens Litigation.

-29-

### 4. The Retailer Defendants Agreed to the Manufacturer Defendants' RPM Policies

85.     Each of the Retailer Defendants agreed to implement and follow the Manufacturer Defendants' RPM Policies.

86.     For example, Meijer states the following on its website:[6]

**What is the Unilateral Pricing Policy or UPP?**

Unilateral Pricing Policy or UPP is where a contact lens manufacturer mandates a minimum price on their contact lens products. Under this policy <> cannot advertise or sell any of these UPP products under the established UPP price. If we do not comply with the manufacturer, they will cease to supply UPP products to us and therefore we would no longer be able to sell it to you, our valued customers.

**Why did the manufacturer adopt UPP and what are the effects?**
The manufacturers state that they have instituted the UPP for their customers however, the adoption of the UPP essentially prevents marketplace competition. This eliminates your ability to shop around for the best price on these contact lens brands, as well as our ability to offer relief.

**Why have the prices of my contact lenses increased since my last order?**

The manufacturers have created a "floor" or a "minimum' price that the lenses may not be priced below. Our prices had been lower than that "minimum" prior to this change in policy. The UPP has caused us to raise our prices on these contact lens brands in order to remain in compliance with this policy. We at <> value you as our customers, so we work directly with the contact lens manufacturers to insure you receive the highest quality product.

---

[6]https://www.meijeroptical.com/about/faqs/ (last accessed March 9, 2015).

87.     Meijer further discloses to its customers that the following is "a list of contact lenses that are currently under these price restrictions by their manufacture[sic]:"[7]

| MANUFACTURER | PRODUCT |
|---|---|
| Bausch & Lomb | ULTRA |
| Alcon | DAILIES TOTAL 1 |
| Alcon | Air Optix Colors |
| Alcon | Dailies AquaComfort Plus Toric |
| Alcon | Dailies AquaComfort Plus Multifocal |
| Vistakon | 1-DAY ACUVUE MOIST |
| Vistakon | 1-DAY ACUVUE MOIST for ASTIGMATISM |
| Vistakon | 1-DAY ACUVUE TruEye |
| Vistakon | ACUVUE OASYS |
| Vistakon | ACUVUE OASYS for ASTIGMATISM |
| Vistakon | ACUVUE OASYS for PRESBYOPIA |

88.     Meijer thus admitted that the Manufacturer Defendants' RPM Policies "caused us to raise our prices on these contact lens brands. . . ."[8]

89.     On or about July 29, 2014, 1-800-Contacts posted the following on its website:[9]

**What is the Unilateral Pricing Policy (UPP)?**

by 1-800 CONTACTS
K Posted on July 29, 2014

**What is UPP?**

UPP stands for Unilateral Pricing Policy. It means the manufacturers of your contact lenses are mandating the minimum price they can be sold for. Because of this, we aren't able to offer any discounts, rebates, or incentives like we used to.

---

[7] https://www.meijeroptical.com/about/faqs/ (last accessed March 9, 2015).

[8] https://www.meijeroptical.com/about/faqs/ (last accessed March 9, 2015).

[9] http://www.1800contacts.com/connect/featured-articles/what-is-unilateral-pricing-policy-upp

-31-

**Why is this happening?**

UPP allows contact lens manufacturers to dictate the price their contact lenses are sold for, effectively eliminating marketplace competition and your ability to shop for the best price. UPP will cause the price of contact lenses to increase drastically – in our case, up to 34%.

**My price has increased a lot from my last order. Why have the prices changed?**

We at 1-800 CONTACTS are committed to protecting your right to buy the quality lenses you expect at the competitive prices you deserve. We obtain all the contact lenses we sell directly from the manufacturer to ensure that our customers receive the highest quality product. When contact lens manufacturers mandate the minimum price for which their products can be sold, we aren't allowed to lower the price or offer any kind of rebates on brands affected by this mandate.

**You used to beat any price by 2%. Why don't you do that anymore?**

We have always stood behind our commitment to beat any price by 2%. While we continue this practice on a large portion of our inventory, manufacturer mandated pricing policies have forced us to discontinue this pricing benefit. We aren't allowed to lower the price or offer any kind of discounts or rebates on products affected by UPP.

**You are the same price as my doctor. I thought you would be better.**

The Unilateral Pricing Policy created by manufacturers sets the minimum price that contacts can be sold for, which restricts our ability to offer a lower price than doctors on those lenses. However, we do offer free torn lens replacement, 24/7 customer service, free exchanges if your prescription ever changes, and a 100% satisfaction guarantee. So while our price is similar because of the manufacturer mandate, we still offer services that your doctor doesn't and at no extra cost.

-32-

90.    1-800-Contacts admitted that, as a result of its agreement to the Manufacturer Defendants' RPM Policies, "we aren't able to offer any discounts, rebates or incentives like we used to." 1-800-Contacts further stated that its prices had risen up to 34% as a result.[10]

91.    1-800-Contacts states that the following contact lenses are subject to the RPM Policies:[11]

| MANUFACTURER | PRODUCT |
|---|---|
| Bausch & Lomb | ULTRA |
| Alcon | DAILIES TOTAL 1 |
| Alcon | Air Optix Colors |
| Alcon | Dailies AquaComfort Plus Toric |
| Alcon | Dailies AquaComfort Plus Multifocal |
| Vistakon | 1-DAY ACUVUE MOIST |
| Vistakon | 1-DAY ACUVUE MOIST for ASTIGMATISM |
| Vistakon | 1-DAY ACUVUE TruEye |
| Vistakon | ACUVUE OASYS |
| Vistakon | ACUVUE OASYS for ASTIGMATISM |
| Vistakon | ACUVUE OASYS for PRESBYOPIA |

92.    1-800-Contacts thus admits that its prices are the same on contacts lenses as those prices charged by ECPs.

93.    Lensdiscounters.com states on its website:[12]

---

[10]http://www.1800contacts.com/connect/featured-articles/what-is-unilateral-pricing-policy-upp

[11]http://www.1800contacts.com/connect/featured-articles/what-is-unilateral-pricing-policy-upp

[12]http://www.lensdiscounters.com/upp.html

-33-

**ABOUT UNILATERAL PRICING POLICIES**

**What is UPP?**

UPP (Unilateral Pricing Policy) is a strategy used by certain contact lens manufacturers, requiring retailers such as ourselves to price their products at a manufacturer's specified minimum price. Retailers who do not comply will no longer be supplied by the manufacturer.

**Why do manufacturers want a UPP?**

Under the guise of price equality, manufacturers want to give eye care practitioners incentive to prescribe their products vs their competitor's products on the basis that the patient will be more likely to buy directly from the doctor if the prices for that contact lens are the same online or elsewhere. Initially, this might seem like a fair practice, but it prevents free market pricing -- and in the end, results in higher pricing to you, the end consumer.

94.     Lensdiscounters.com further explains:[13]

**Which contact lens companies have a UPP?**

Alcon has already adopted the UPP to their Dailies Total 1 and will soon implement it on some of their new products. Johnson & Johnson, the manufacturer of Acuvue Oasys lenses, has implemented a UPP program as of July 2014. We anticipate that other contact lens companies will follow suit in the future.

**Will I be paying more for my lenses?**

Rest assured, we will continue to sell at the lowest allowable price to our customers and continue to offer the reliable service that you've come to expect from us. We suggest that on your next visit to the eye doctor, you ask to be fit into a lens that doesn't have any dictated minimum pricing, ensuring that you can still take advantage of the lowest prices for contacts lenses online at LensDiscounters.com. You need to be sure that your doctor is prescribing you a certain lens because it's best for you, not best for their pocket book.

---

[13]*Id.*

**What can I do about the UPP?**

As suggested above, asking to be fit for an alternative brand that doesn't have a UPP will keep you from having to pay the higher price. If you are unable to switch, or just prefer the lenses you are currently wearing -- you can make a statement by purchasing the lenses online through us even if the prices are the same at your doctor. We're just a click away, and we save you time by not having to go anywhere to get your lenses and we're good at what we do!

At LensDiscounters.com, we strive to provide a fair and transparent shopping experience to all of our customers and do not believe price controls are in the best interest of our customers. We will do what we can to fight these pricing policies and keep eyecare affordable for our customers. We will continue to keep you informed and will have more information about UPP soon.

95.    Lensdiscounters.com thus admits that its agreement to the RPM Policies "results in higher pricing to . . . the end consumer."[14]

96.    As reflected above, Costco filed suit against J&J for its imposition of an RPM Policy. Nonetheless, Costco has admitted that it has agreed to follow the policy and that its agreement to the RPM Policy "has resulted in substantially higher prices on J&J lenses that Costco sells."[15]

97.    Costco alleges that "[t]he concerted action has injured . . . competition, and consumers, including Costco members, through decreased competition, increased prices and administrative costs, and reduced choice, quality, innovation, and output.[16]

---

[14]*Id.*

[15]Complaint, ¶ 9, *Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 4:15-cv-00941(N.D. Cal.), Mar. 2, 2015, ECF No. 1.

[16]*Id.*, ¶ 80.

## 5. The RPM Policies and Concerted Action Harm Competition

98.     Defendants' agreement to implement RPM Policies has harmed and continues to harm competition by increasing prices for the contact lenses made subject to them.  Consumers ultimately pay the economic cost of this wrongful conduct in the form of higher prices for contact lenses affected by RPM Policies.

99.     At the Senate Hearing, Zeidner presented the following graphic showing a range of a 40% to 112% difference between the lowest internet price for J&J's affected products and its UPP price.

100.     George Slover, Senior Policy Counsel for the Consumers' Union, and Atkinson gave similar testimony at the Senate Hearing.

101.     Zeidner noted that as of July of 2014, RPM Policies encompassed 40% of the market and predicted 80% coverage by the end of 2015, especially with ECPs writing prescriptions for contact lenses subject to the policy.  As noted above, since his testimony at the Senate Hearing, Cooper Vision adopted an RPM Policy on one of its contact lens lines.

102.     Similar testimony was given by Jay Magure ("Magure"), the Vice-President of Governmental Affairs for 1-800-Contacts, at the aforementioned February 17, 2015 hearing before the Utah Senate Business & Labor Committee.  He noted that because of J&J's adoption of RPM Policies, 1-800-Contacts was compelled to eliminate rebates of between $15 and $100 on numerous J&J ACUVUE® products.  The result was that it effectively was forced to raise prices on the vast majority of the contact lenses it sells that are subject to RPM Policies.  In a January 24, 2015 article, Oregonlive.com corroborated this point with a real-world example, noting how 1-800-Contacts sold a 90-lens box of J&J ACUVUE® MOIST® contact lenses a year ago at a price as low as $57.49, but

the same product is now sold by it for a low of $63.74. In his aforementioned testimony, Magure noted that a survey of 780 doctors conducted by 1-800-Contacts both before and after J&J's implementation of RPM Policies confirmed that prices for J&J contact lenses subject to such RPM Policies increased by 57% when compared to pre-UPP levels.

103. Similarly, the website <stoppupp.org> has published this comparison of J&J's December 2013 contact lens prices (accounting for rebates and mail-in coupons) and its post-UPP prices:

| J&J Product | Old Price | UPP Price | % Change |
|---|---|---|---|
| 1-Day ACUVUE® MOIST® (30 Lenses) | $13.80 | $33.00 | + 139 percent |
| 1-Day ACUVUE® MOIST® (90 Lenses) | $36.49 | $63.50 | + 74 percent |
| 1-DAY ACUVUE® MOIST® for ASTIGMATISM (30 Lenses) | $18.24 | $34.50 | + 89 percent |
| 1-Day ACUVUE® TruEye® (90 Lenses) | $47.75 | $82.50 | + 73 percent |
| ACUVUE® OASYS® with Hydraclear Plus (12 Lenses) | $22.68 | $67.50 | + 198 percent |
| ACUVUE® OASYS® with Hydraclear Plus (24 Lenses) | $44.23 | $110.00 | + 149 percent |
| ACUVUE® OASYS® for ASTIGMATISM (6 Lenses) | $21.74 | $40.00 | + 84 per cent |

-37-

| ACUVUE® OASYS® for PRESBYOPIA | $22.96 | $40.00 | + 74 per cent |
|---|---|---|---|

104.   The effect of RPM Policies is reflected on the websites of internet retailers of contact lenses.  In response to the questions about why it no longer beats the prices of others for contact lenses by 2% and why it charges the same as doctors, 1-800-Contacts' website states:

> We have always stood behind our commitment to beat any price by 2%.  While we continue this practice on a large portion of our inventory, manufacturer mandated pricing policies have forced us to discontinue this pricing benefit.  We aren't allowed to lower the price or offer any kind of discounts or rebates on products affected by UPP. . . . The [UPP] created by manufacturers sets the minimum price that contacts can be sold for, which restricts our ability to offer a lower price than doctors on those lenses.

105.   Similarly, the website of LensDiscounters.com has this to say about RPM Policies:

> UPP (Unilateral Pricing Policy) is a strategy used by certain contact lens manufacturers, requiring retailers such as ourselves to price their products at a manufacturer's specified minimum price. Retailers who do not comply will no longer be supplied by the manufacturer. . . . Under the guise of price equality, manufacturers want to give eye care practitioners incentive to prescribe their products vs. their competitor's products on the basis that the patient will be more likely to buy directly from the doctor if the prices for that contact lens are the same online or elsewhere.  Initially, this might seem like a fair practice, but it prevents free market pricing -- and in the end, results in higher pricing to you, the end consumer. . . . .At LensDiscounters.com, we strive to provide a fair and transparent shopping experience to all of our customers and do not believe price controls are in the best interest of our customers.  We will do what we can to fight these pricing policies and keep eyecare affordable for our customers.  We will continue to keep you informed and will have more information about UPP soon.

106.   Meijer's website contains the following statements:

> The manufacturers state that they have instituted the UPP for their customers however, the adoption of the UPP essentially prevents

-38-

marketplace competition. This eliminates your ability to shop around for the best price on these contact lens brands, as well as our ability to offer relief. . . . The manufacturers have created a "floor" or a "minimum" price that the lenses may not be priced below. Our prices had been lower than that "minimum" prior to this change in policy. The UPP has caused us to raise our prices on these contact lens brands in order to remain in compliance with this policy.

107. Likewise, 1-800-GET-LENS told its customers that "Bausch & Lomb has implemented a Unilateral Pricing Policy (UPP) on all retailers, both online and bricks and mortar. The UPP prevents anyone from selling Bausch & Lomb products below a certain price." A representative for Costco testified before the Washington Senate Health Care Committee on February 16, 2015 that the Manufacturer Defendants' implementation of RPM Policies has caused it to raise prices on affected contact lenses by as much as 35%.

108. In mid-2014, Costco conducted an analysis of its prices for Alcon's DAILIES TOTAL1 contact lenses before and after Alcon implemented MRPM. It concluded that the price for a 90-lens pack increased from $85.00 to $95.00. It also examined J&J prices, and concluded that J&J's RPM Policy required Costco to raise its prices an average of 26%. Costco makes similar allegations in the *Costco Action*.

109. Gerber, in his article quoted above, also confirms that RPM Policies have the effect of elevating contact lens prices. Indeed, at a January 29, 2015 hearing before the Mississippi Senate Public Health & Welfare Committee, 1-800-Contacts presented econometric evidence that the use of RPM Policies going forward could cost contact lens consumers as much as $2 billion annually. Defendants' conspiracy has thus caused Plaintiff and members of the Class to pay supracompetitive prices for contact lenses and has substantially eliminated price competition in the market.

-39-

### 6. There Is No Justification for the RPM Policies

110. In *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) ("*Leegin*"), the Supreme Court identified three factors to be used in determining whether an RPM program is unreasonable: (a) whether several competing manufacturers adopt RPM programs; (b) whether retailers play a role in instigating RPM programs; and (c) whether manufacturers or retailers have market power. *Id*. at 897-98. The Court made it clear that "the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated." *Id*. at 894.

111. The *Leegin* factors are satisfied here. Alcon, J&J, Cooper Vision, and B&L have all adopted RPM Policies. Collectively, the Manufacturer Defendants control 97% of the domestic contact lens market (by revenue). Independent ECPs also prescribe the majority of contact lenses sold in the United States. Under *Leegin*, these facts alone are sufficient to justify stricter scrutiny.

112. The second *Leegin* factor is also satisfied. Independent ECPs and ABB played a significant role in instigating manufacturers to adopt RPM Policies. ABB worked with all four Manufacturer Defendants to impose the RPM Policies. As the dominant distributor in the market, ABB has the power to foreclose price competition. In addition, J&J stated that it developed its RPM Policy after listening to ECPs' "feedback" and they were "instrumental" in the creation of that policy. Cooper Vision has also admitted as much. This is consistent with Independent ECPs' other conduct aimed at keeping out low-cost competitors, including their campaign in the 1980s and 1990s to boycott mail-order contact lens suppliers, their public opposition to sales of contact lenses by nontraditional retailers (such as Costco), and their resistance to giving patients their prescriptions, as required by federal law.

-40-

113. Nor do the RPM Policies have any procompetitive justification. These policies do not prevent free-riding because the ECP is compensated for his or her services (the eye examination), even if the patient fills the prescription elsewhere. As noted above, concerns about harm to patients from buying contact lenses from other than ECPs are pretextual and do not justify the anticompetitive conduct claimed here. Furthermore, the Manufacturer Defendants' RPM Policies do not encourage ECPs to focus more on patient needs instead of contact lens costs. Instead, they do just the opposite; as several ECPs have said, a "savvy" ECP will always prescribe a contact lens subject to a MRPM agreement over another one, because the ECP will earn a greater profit.

### C. Anticompetitive Effects and Injury

114. Multiple studies conducted prior to implementation of the RPM Policies found that contact lenses were cheaper when purchased online or from big-box stores as opposed to Independent ECPs.

115. As noted in the 2004 FTC Report, a 1998 study found that the average price of a six-lens pack of contact lenses was roughly 19 percent more expensive when purchased from an independent ECP instead of from one of the other categories of retailers.

116. The 2004 FTC Report also presented a March 2004 study by 1-800-Contacts reflecting similar results, which are set forth below.

117. In the 2005 FTC Report, the FTC examined the prices of a six-month supply of ten different contact lenses from 20 online retailers (including four hybrid retailers, or retailers with both an online and offline presence) and from 14 offline retailers in Northern Virginia. It found that contact lenses are, on average, "$15.48 less expensive online than offline" and that "[w]holesale clubs . . . [were] the least expensive channel overall, offering prices that averaged around $30 less

-41-

than independent ECPs, around $9 less than all online outlets, and about $6 less than pure online retailers." The cumulative results of this study are set forth below.

118.     Based in part on this study, the FTC concluded that the FCLCA's provision requiring ECPs to provide the patient with a prescription that the patient can then use elsewhere had increased competition and reduced contact lens prices across the country.

119.     The significant price disparities between ECP pricing and mass merchandiser and on-line retailers (and resulting savings for the consumer) continued until the Defendants imposed RPM Policies.

120.     After the imposition of the RPM Policies, he anticompetitive concerted action has harmed consumers, most directly by increasing the prices they pay for contact lenses.

121.     For example, prior to J&J's RPM Policy, Costco's prices for contact lenses were generally 25 to 30% lower than those of many competitors.  1-800 Contacts similarly reported that, for example, for one J&J brand, ACUVUE Oasys, it was forced to increase its prices about 30% as the result of J&J's RPM Policy.  *Consumer Reports*, an independent nonprofit organization, also analyzed the RPM Policies and found that they do not provide any benefits and only increased prices for consumers.

## V.  RELEVANT MARKETS

### A.     Relevant Product Markets

122.     Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.

-42-

123.     To the extent such allegations are required, however, the relevant markets include (1) the upstream market for contact lenses available at wholesale ("Wholesale Contact Lens Market"), and (2) the downstream retail markets for each brand and type of contact lens ("Retail Contact Lens Markets"). The Wholesale Contact Lens Market and Retail Contact Lens Markets are collectively referred to herein as the "Contact Lens Markets."

124.     The Wholesale Contact Lens Market is a cognizable antitrust market. The boundaries of the Wholesale Contact Lens Market are determined by the low cross-elasticity of demand between contact lenses and potential substitutes. A small non-transitory increase in price for contact lenses would not cause consumers of contact lenses to switch to glasses or any other product or service to correct the consumer's vision in sufficient numbers to defeat the price increase.

125.     The Wholesale Contact Lens Market is highly concentrated, with only four main competitors, and concentration has been increasing. J&J has market power. J&J's current market share is at least 43%, Alcon's is approximately 23%; Cooper Vision's is approximately 22%; and Bausch & Lomb's is approximately 11%. According to Costco, J&J's market share underestimates J&J's actual market power given such factors as the high barriers to entry and high concentration in the Wholesale Contact Lens Market.

126.     The Wholesale Contact Lens Market has high barriers to entry. The design and manufacture of contact lenses requires complex technology, know-how, and skilled labor that takes years to develop. Manufacturers bear substantial up-front research and development costs as well as significant facility and other infrastructure costs. Entry barriers for contact lens manufacturers include patents and necessary regulatory approvals. The cost of competing in the Wholesale Contact Lens Market includes significant costs for marketing and advertising.

127.     The Retail Contact Lens Markets are cognizable antitrust markets.  The boundaries of the Retail Contact Lens Markets are determined by the low cross-elasticity of demand between contact lenses and potential substitutes.  Because a retailer cannot substitute for the prescribed brand and type of contact lens, the retail markets are limited to each brand and type of contact lens that can be prescribed.

128.     A small non-transitory increase in price for contact lenses would not cause consumers of contact lenses to switch to glasses or any other product or service to correct the consumer's vision in sufficient numbers to defeat the price increase.  Nor would a small non-transitory price increase cause contact lens distributors or retailers to otherwise change their activities sufficiently to make such a price increase unprofitable to a manufacturer with market power.  Consumers are unable to constrain market abuses because the ECP prescribes the brand and type.

129.     Today, consumers with a prescription from an ECP can purchase their contact lenses from a variety of sources, including independent ECPs, national optical chains (*e.g.*, LensCrafters), mass merchandisers (*e.g.*, Wal-Mart and Target), wholesale clubs (*e.g.*, Costco), and\online retailers (*e.g.*, 1-800-Contacts and LensDiscounters.com).

130.     Cumulatively, 35 million Americans spend roughly $4.2 billion per year on contact lenses in these various retail channels.

131.     The 2005 FTC Report presents data from both Ocular Sciences, Inc. ("OSI") and 1-800-Contacts on the share of filled prescriptions and sales for contact lenses through these various retail channels.  The OSI figures were as follows:

| Retailer Type | Share of Patient Visits | Estimated Share of Filled Prescriptions |
|---|---|---|
| Independent MD | 14.1% | 12.3% |
| Independent OD | 52.6% | 45.8% |
| Independent Stores and OD Groups | 12.2% | 10.6% |
| Chain Retailers and Optical Stores | 21.0% | 18.4% |
| Mail Order/Internet | n/a | 13.0% |

132.    The data presented by 1-800-Contacts were as follows:

| Channel | Estimated Share of Filled Prescriptions |
|---|---|
| Independent MD | 4.3% |
| Independent OD | 64.3% |
| Mass Merchandisers | 13.0% |
| Chain Retailers | 9.5% |
| Mail Order/Internet | 8.0% |

133.    The FTC concluded that both sets of data told the same story: "Manufacturers distribute the largest share of lenses through independent ECPs and the smallest through the online/mail-order channel."

134.    A more recent Industry survey has estimated that retail chains' and mass merchandisers' share of contact lens sales will reach 20.5% on 2015, while online retailers' share will reach 9.2%.

-45-

### B. Geographic Market

135. The geographic market is the United States. Because of legal restrictions on contact lens prescriptions, the Manufacturer Defendants package their products specifically for the United States market.

## VI. CLASS ACTION ALLEGATIONS

136. Plaintiff brings this action both on behalf of herself and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b) (3), on behalf of the following class (the "Class"):

> All persons in the United States who purchased disposable contact lenses manufactured by Alcon Laboratories, Inc., Johnson & Johnson Vision Care, Inc., Bausch + Lomb, and/or Cooper Vision, Inc. Which were subject to an RPM Policy directly from Defendants Wal-Mart Stores, Inc., Meijer, Inc., Costco Wholesale Corporation, 1-800-Contacts, Inc., and/or LensDiscounters.com between June 1, 2013 and the present.
>
> Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

137. Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants. Plaintiff believes that, due to the nature of the trade and commerce involved, there are most likely hundreds of thousands of Class members, geographically dispersed throughout the United States such that joinder of all Class members is impracticable.

138. Plaintiff's claims are typical of the claims of the Class in that Plaintiff and Class members all purchased contact lenses subject to a Manufacturer Defendant's RPM Policy from a Retailer Defendant who agreed to abide by the RPM Policy. All Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the class.

-46-

139.     Numerous questions of law or fact arise from Defendants' anticompetitive conduct that is common to the Class, including but not limited to:

(a)     Whether the Manufacturer Defendants engaged in a contract, combination, and/or conspiracy among themselves and with ABB and the ECPs to fix, raise, maintain, or stabilize prices of contact lenses sold in the United States;

(b)     Whether the Manufacturer Defendants' RPM Policies operated as unreasonable restraints of trade;

(c)     Whether the Retailer Defendants engaged in a contract, combination, and/or conspiracy with the Manufacturer Defendants to fix, raise, maintain, or stabilize prices of contact lenses sold in the United States;

(d)     Whether Defendants' conduct caused the prices of contact lenses sold in the United States to be sold at artificially high and supra-competitive levels;

(e)     Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

(f)     The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

140.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

141.     Plaintiff's claims are typical of the claims of the Class because, like other Class members, Plaintiff purchased contact lenses covered by one or more of the Defendants' RPM Policies.

142.     Plaintiff will fairly and adequately represent the interests of the Class in that she has no conflict with any other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust, class action, and other complex litigation.

-47-

143.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

144.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.  Prior class action litigation involving similar conduct with respect to a similar consumer class and the same products was successfully managed through trial in the case of *In re Disposable Contact Lens Antitrust Litig.*, MDL No. 1030 (M.D. Fla.).

145.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.  CAUSES OF ACTION

## COUNT ONE

## VIOLATIONS OF SHERMAN ACT, 15 U.S.C. § 1

146.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

147.     Beginning in June of 2013 and continuing to the present, Defendants have engaged in a conspiracy and agreement in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

148.     The Manufacturer Defendants implemented RPM Policies in concert with each other and with Independent ECPs, acting, in part, through Defendant ABB, which is complicit in their implementation.  The Manufacturer Defendants agreed, at least tacitly, among themselves to start using RPM Policies, recognizing that the policies could be enforced only if all of them implemented

RPM Policies. The Manufacturer Defendants also conspired with Defendant ABB and with Independent ECPs to implement RPM Policies. The Retailer Defendants agreed to abide by the RPM Agreements as evidenced by their continued sale of the Manufacturer Defendants' products.

149.     As a result of Defendants' unlawful conduct, prices for contact lenses subject to RPM Policies were raised, fixed, maintained and stabilized in the United States.

150.     As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for contact lenses than they otherwise would have paid in the absence of that conduct.

151.     Plaintiff seeks injunctive relief, actual damages, compensatory relief, treble damages and attorneys' fees and costs.

## COUNT TWO

### VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT,
### TENN. CODE ANN. §§ 47-25-101 ET SEQ.

152.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

153.     The Tennessee Trade Practices Act ("TTPA"), Tennessee Code Annotated § 47-25-101, provides:

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

-49-

154.     Tennessee law also allows any person injured indirectly, like the Plaintiff and Class members, to seek redress for their injuries arising out of illegal arrangements.  Tenn. Code Ann. § 47-25-106 provides:

> Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

155.     In *Freeman Indus., LLC v. Eastman Chemical Co.,* the Tennessee Supreme Court ruled that the TTPA was triggered not by anti-competitive conduct but by "the effect of the anti-competitive conduct." The Supreme Court also held that the TTPA's applicability, whether invoked by Tennessee residents *or* non-residents, should be judged by "whether the alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree." *Id.*

156.     During the Class Period, Defendants' illegal conduct substantially affected Tennessee trade and commerce and caused injury to consumers in Tennessee.

157.     Defendants and unnamed co-conspirators entered into and engaged in an agreement, contract, arrangement, combination or conspiracy which lessened or tended to lessen full and free competition in the markets for contact lenses in violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.

158.     The acts done by Defendants as part of, and in furtherance of, their and their co-conspirators' agreement, contract, arrangement, combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

-50-

159. The anti-competitive acts were intentionally directed at the Tennessee markets for contact lenses and had a substantial and foreseeable effect on Tennessee trade and commerce.

160. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices with respect to contact lenses.

161. Defendants' anti-competitive acts described above were knowing and willful and constitute violations or flagrant violations of the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, et seq.

162. Defendants' arrangements, contracts, agreements, trusts, combinations, or conspiracy to fix, raise, maintain, or stabilize the prices of contact lenses marketed, distributed, or sold in Tennessee and elsewhere had the following effects on Tennessee commerce:

    (a)    The prices of contact lenses purchased by Class members were fixed, raised, maintained, and stabilized at inflated, artificial and noncompetitive levels;

    (b)    Class members were deprived of free and open competition in the purchase of contact lenses;

    (c)    Competition in the sale of contact lenses was restrained; and

    (d)    Class members paid higher prices for contact lenses than they would have paid absent Defendants' arrangement.

163. During the Class Period, Class members purchased millions of dollars worth of Defendants' contact lenses in Tennessee. By reason of Defendants' violations of the TTPA, Plaintiff and Class members paid significantly more for contact lenses than they would have paid absent Defendants' illegal arrangement, and, as a result, Plaintiff and Class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

-51-

164.     Defendants' arrangements, contracts, agreements, trusts, combinations, conspiracy

further substantially affected Tennessee commerce because one or more of the Defendants, either

directly or through their agents, engaged in the following activities in or affecting commerce in

Tennessee:

(a)     Transacted contact lenses business in Tennessee;

(b)     Contracted to supply or obtain goods or revenue related to the
        contact lens business in Tennessee;

(c)     Intentionally availed themselves of the benefits of selling
        contact lenses in Tennessee;

(d)     Produced, promoted, sold, marketed, and/or distributed
        contact lenses in Tennessee, thereby purposefully profiting
        from access to Tennessee's contact lens markets;

(e)     Caused tortious damage in Tennessee by fixing contact lens
        prices;

(f)     Caused tortious damage in Tennessee by acts or omissions
        committed outside Tennessee by regularly doing or soliciting
        business in Tennessee; engaging in other persistent courses of
        conduct within Tennessee; and/or deriving substantial
        revenue from goods used or consumed or services rendered in
        Tennessee; and

(g)     Committed acts and omissions that they knew or should have
        known would cause damage (and, in fact, did cause damage)
        in Tennessee while regularly doing or soliciting business in
        Tennessee; engaging in other persistent courses of conduct in
        Tennessee; and/or deriving substantial revenue from goods
        used or consumed or services rendered in Tennessee.

165.     During the Class Period, Defendants' arrangement substantially affected Tennessee

commerce in the following additional ways:

(a)     ***The Arrangement's Substantial Effect on Tennesseans'
        Trade or Commerce:***   Some antitrust arrangements only
        affect the commerce of a limited geographic region or a

-52-

limited number of residents. Defendants' arrangement, however, was more far reaching – it substantially affected tens or hundreds of thousands of Tennessee residents. Those contact lenses were purchased by virtually every segment of society and in all geographic regions. There could hardly be anti-competitive conduct with a more substantial effect on the commerce of Tennessee and Tennesseans than Defendants' illegal conduct alleged here.

(b)     ***The Substantial Monetary Effect on Tennessee Trade or Commerce:*** Defendants' arrangement began in June 2013 and is ongoing (the "Class Period"), and over that time, they sold millions of dollars worth of contact lenses in Tennessee. With even a modest estimated overcharge during that time, Defendants illegally profited millions of dollars from their arrangement.

(c)     ***Substantially Harmful Effect on the Integrity of the Tennessee Market:*** The Tennessee market is vulnerable and can be manipulated by companies either from outside Tennessee, inside Tennessee, or both. Without enforcing Tennessee's antitrust law to its fullest extent, as expressed by the Tennessee Supreme Court, companies that break the law will remain unpunished, and they will remain able to prey upon Tennessee residents without fear or consequence. The Tennessee Supreme Court explained that "the purpose of the TTPA is to protect the state's trade and commerce affected by anticompetitive conduct." Defendants have shattered this very purpose by victimizing the Tennessee contact lens markets. Thus, every level of the Tennessee markets' integrity has been compromised – from the manufacturer to the consumer.

(d)     ***The Substantial Adverse Effect on Tennessee Commerce was Critical to the Criminal Arrangement's Success:*** To ensure their arrangement's effectiveness, Defendants knew that Tennessee commerce had to be, would be, and was substantially affected in order to carry their arrangement out.

166.    The results of Defendants' actions occurring outside Tennessee also substantially affected Tennessee commerce by increasing the prices Tennesseans paid for Defendants' contact lenses.  As the result of Defendants' illegal actions' substantial effect on Tennessee commerce, Tennessee purchasers of Defendants' contact lenses have been injured.

167.    Plaintiff and Class members have been injured and will continue to be injured in their business and property by paying more for contact lenses purchased directly from the Manufacturer Defendants and their co-conspirators than they would  have paid and will pay absent the conspiracy.

168.    The alleged agreement, contract, arrangement, combination or conspiracy is a *per se* violation of the Tennessee Trade Practices Act.

169.    Plaintiff and Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## VIII.  JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## IX.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.    This action may proceed as a class action, with Plaintiff as the designated Class representative (and where appropriate, subclass representative) and Plaintiff's counsel as Class Counsel;

B.    Defendants have engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the Tennessee Trade Practices Act, § 47-25-106,

-54-

and that Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal and Tennessee antitrust laws, and that a judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled to the extent such trebling is permitted pursuant to such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

E.      Plaintiff and members of the Class be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

F.      Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiff and members of the Class receive such other and further relief as may be just and proper.

Respectfully submitted, this 30th day of March, 2015.


/s/ Gordon Ball _____
Gordon Ball
TN BPR#001135
Lance K. Baker
TN BPR# 032945
**GORDON BALL PLLC**
7001 Old Kent Drive
Knoxville, TN 37919
Tel: (865) 525-7028
Fax: (865) 525-4679
Email: gball@gordonball.com

*Counsel for Plaintiff*